Case number 18-1141. Idaho Conservation League, et al. Petitioners v. Andrew Wheeler, Administrator, U.S. Environmental Protection Agency, et al. Petitioners, Mr. Clark, have responded to Mr. Burgess for the industry intervenors. Mr. Burgess has responded to Mr. Burgess for the industry intervenors. Good morning. May it please the Court, my name is Amanda Gooden and I represent Petitioners. I'd like to reserve three minutes for rebuttal. Today I'd like to address EPA's two primary rationales for its final action here and why those are both contrary to circle and arbitrary. And those are its new focus on taxpayer costs and what it calls modern mining. But turning first to taxpayer costs, that exclusive focus is inconsistent with circle. It leaves out the health and environmental risks that are central to the statute, and it even leaves out most of the information on cost of cleanup that's explicitly listed in 108b2. And this new exclusive focus led EPA to dismiss most of the evidence of risk that it had before it in the record. So, for example, at JA53, that's an EPA's technical support document, they say, they look at a bunch of different sites and say, none of these tell us anything about risk, regardless of, you know, the harm that occurred, whether the assurances were adequate, because they haven't yet imposed taxpayer costs, they don't tell us anything. Same thing at JA10, that's from the final action. Do you agree that the key statutory issue here is construing 9608? That's the key provision we have to look at. And we live in the world of Chevron, for better or for worse, we live in the world of Chevron. And so will you point me to the specific language within 9608B that says that the President has to issue financial responsibility regulations targeting, because of the hazard that the industry provides to the environment, as opposed to the government's argument where they're concerned about the risk of damage to the fund itself. It seems to me that's the key statutory issue. Has Congress spoken clearly in support of your argument? And if you can help me understand the language that gives that clear directive unambiguously, that would be important. So, looking at just the language in a vacuum to start. In B1, Congress referred to risk of injury, and EPA, interveners, everyone agrees risk of injury means injury to health and the environment. That's the prioritization. And then it says when you look at whether to impose financial assurances, they need to look at the risks associated with the degree and duration of risk associated with these specific activities, associated with their production, transportation, disposal of these substances. So you're saying in subsection 1, that that's only talking about health and the environment? Not only, Your Honor. We think that they can also consider financial risk there. We think that when you look at CERCLA as a whole, it makes clear that health and the environment has to be part of the equation. But we're not saying that you need to ignore financial risk or exclude that. But that is what they did here. And even... Well, as I understand it, the purpose here of these provisions is to make certain that industries that cause, that present risk to the health and the environment, that they're going to be the ones to pony up the money to pay for the cleat, right? That is one of the purposes of this provision. The other is to prevent pollution in the first place. And this court in Rayataho Conservation League already looked at the legislative history of 108B1 and said this was one of Congress' major goals in this provision specifically. So we think it has twin goals. It's preventing pollution, preventing this harm, and then making sure that if it occurs, it gets cleaned up. So your understanding of this statute is hypothetical. Your understanding of the statute that if it was clear that the industry had sufficient financial means to cover any cleanup costs that might occur, it's a hypothetical, right? They had sufficient means. That the President would still be required to issue regulations? Not necessarily. It depends on what you mean by adequate assurances. So if you have a facility that has $50 million in assurances, and they have incredibly risky practices in place, and that $50 million is all an unsecured promise to pay, you might look at that and say, no, it's not adequate. If they have $50 million and best practices in place and a third-party bond, then yeah, we think it's fine for EPA to not impose assurances on that facility. And I know that's exactly what they proposed to do at JA 1809 to 1810 in the proposed rule. They went through facility by facility and said, we're going to look at what practices you have in place and what other assurances are there. And where this isn't needed, we're not going to impose it. But the problem is here. I'm looking at something more fundamental, something more basic. Before that, is there language in the statute that compels the President to issue regulations? Well, it says EPA shall issue these rules based on the risk that exists. And so for EPA to say, well, there's very high risk, but we just don't feel like it, that's not consistent with the statute. So if you look at the ---- But your argument has to be that it's talking about risks there, that it's talking about risks to the environment. Well, Your Honor, even if it's ---- And not risks to the fund itself, which is the argument that your opponents have taken. And as I understand it, we have to decide with you, we have to say, yeah, that's clearly what Congress was saying, that they wanted they told the EPA, you have to look at risk to the environment. And if the industry poses a risk to the environment, then you have to issue the regulations. Really quite apart from whether the fund is protected or not. No, we think they need to look at both. And even if they could say, we're looking only at financial risk, that's the only thing we're considering, not risk to health and the environment. First of all, that doesn't get you that far away from health and environmental risks, because the cleanup standard under CERCLA is clean up to a level that protects health and the environment. So how much you have to pay to clean up is going to really circle back to how much harm you did. And then even in the universe of financial risk, this exclusive focus on whether taxpayer costs have already been incurred, that even cuts out most of that universe. So EPA has said they can look at the B2 factors, and that's all they have to look at for the determination of their 108B1, whether they need to regulate. And there Congress said, look at the cost of the fund, yes, but also the cost of private cleanup, the cost of court settlements, the list. And EPA crossed off most of that list and said, the only thing we're going to look at is whether sites have already incurred taxpayer costs, even if they're at clear risk of incurring them in the immediate future. So even under their own narrow view, that it's just financial risk. Back to where we started with the Chevron question, what is the part of 9608, or any other part of the statute, in which Congress clearly mandates the president to issue regulations under this circumstance? Which language are you looking at? Well, in 108B1, they say... Let's use the code. Sorry, in 9608B1, they say EPA shall issue financial assurance rules consistent with the degree and duration of risk associated with these activities, and they shall prioritize the industries that pose the highest risk of injury by no later than 1983. If they don't find the risk that we're concerned with, then the shell is no longer operative. Would that not be correct? Or at least a reasonable agency could so construe it under a Chevron review. I'm sorry. You said if there's no risk, they don't have to regulate? Right. If they don't find a risk in terms of what the statute is contemplating in their interpretation, then are they still under a mandate to issue regulations? No, of course not. If there's not risk there, then it would be consistent with the degree and duration of risk to not have financial assurance requirements. They don't have to regulate everyone in the country. But here, they had abundant evidence of risk in front of them, and they just simply said it wasn't relevant. Let's take this back then to what risk it is the agency is supposed to be looking at. And under Chevron, how can we say that we shouldn't uphold their view of risk rather than your view of risk? Well, because we have a statute that is directed as a whole towards protecting health and the environment. We have a prior decision from this court saying preventing pollution is a key part of that specific statutory provision. And again, even if you're looking only at financial risk, it circles back to health and the environment because how much harm you did dictates how much you're going to have to pay to clean up. And in the universe of financial risk, they still omitted most of what Congress said explicitly you have to look at. In Subsection 2, when it talks about risk, though, it talks about the level of risk which the President, in his discretion, believes is appropriate based on, and then these other factors. They all seem to be talking about the fund, the solvency of the fund. Solvency may not be the right word, but it seems that they're talking about that the goal is to avoid taxpayer funding for cleanups. They want it to be borne by the industry. They do want it to be borne by the industry that's causing the pollution. That is one of the goals of this section. And they said to figure out, you know, what B2, so it's important to know that B2 says and B1 is about whether you need to regulate in the first instance. When you're looking at the dollar amount, they said, you know, look at all of this different information on what... What do you think it means in Subsection 2, that the President, in his, the level of risk which the President, in his discretion, believes is appropriate? What does that mean? So that's, in deciding the dollar amount and the form of assurances that they established under B2, there's some discretion in deciding the level of risk they want to protect against. But they still have to base that decision on... Well, right, but isn't that a problem for your argument? If there's discretion in the level of risk they want to protect against, what if they decide the level of risk is sufficient that we don't need to protect against it? It's already protected, which is their argument. Well, they still, we think that that language, letting that language swallow everything else in the section, everything else in 9608, that gives it too broad a meaning. So if they said, you know, no matter how high the risk in our discretion, we think nothing is necessary, that's not consistent with the rest of the directive there. So they do have some discretion there, but it can't swallow everything else. But they did here let it swallow everything else. I'd also like to point out at JA10, which is from the final action, when they're explaining why they don't need to consider any of the findings on practices and on the harm that contemporary mining practices have caused, they say, again, this information didn't include specific detail on taxpayer costs that have already been incurred, so we don't have to look at it. And to underscore, with this focus on taxpayer costs that have already been incurred, what they're basically saying is the only way for a facility to show risk that might warrant assurances is once it's too late for assurances. Because once the taxpayers have already incurred costs at the site, it's too late to prevent the harm. It's too late to make the polluter pay. That's why the taxpayers are paying. And financial assurances don't do anything at that point, because there's no one to impose them on. If the taxpayers are paying, the polluter's already out of the picture. So if they're saying, only once a site already incurs those costs can it show risk, that means you never have financial assurances for any site, and that can't be what Congress intended here. I want to turn quickly to modern mining, which is their other core rationale for their final action. So when they talk about modern mining, they're not talking about best practices or some sort of minimum standards. It is whatever every state happens to have on the books at this moment. So it can be one thing in California, something very different in Alaska. If Montana loss is one thing today and it changes tomorrow, it was modern mining today, what it was. And then when they change it, it's modern. It's a new thing. It's modern mining. It's different tomorrow. So it's not tethered to actual risk, either financial risk or health and environmental risk. They also are defining it to exclude most of the currently operating mines that they propose to regulate under the rule. There's a complete list at JA 1975 of the mines that would have been regulated, and many of those are the same mines that they say in their final action and their support document are not modern and they don't have to consider them. And that's an exercise in defining the problem away instead of explaining why it is actually gone. And specifically, they also seem to be saying that any activity that happened at those mines in the past, they don't have to consider, and that again is inconsistent with the plain language of B1, which directs them to look not just at the instance the waste was generated. They have to consider also risks associated with ongoing storage and disposal and treatment of waste at those facilities. So if they pulled the ore out of the ground however long ago, and there is then still waste that's sitting today in a tailings pond or a storage impoundment, and that poses ongoing risks, that's explicitly listed in the statute as something they have to look at. And it also directs the court to JA 2180, which is the waste management section, their findings in support of the proposed rule, where they make clear that managing these site features are an ongoing concern, that what the mine does today and tomorrow and 10 years from now and beyond matters. It's not like once this waste is generated, then you just ignore the problem is solved. Jeff Clark May it please the court, I'm Jeff Clark, here on behalf of EPA from the Justice Department. Let me begin with Judge Griffith's observation that we're in the world of Chevron. So we are in the world of Chevron on this statute. And this statute, we think, although it uses the word shall, as Judge Centel was getting at, you know, it uses that once, but all of the other terms in Section 9608B1 are all ones that convey discretion. The main language I would point you to is the fact that the agency has to look at But it doesn't convey discretion about whether regulations are to be issued. It says shall promulgate regulations. Maybe the substance of those fall within the area of discretion, but it does say shall promulgate regulations. Well, Your Honor, but the key observation is the one that you made, that it doesn't mandate that there be regulation from any particular class of facilities. And so the agency, which is the delegee of the president here, they have the discretion to decide what those classes are. There's nothing mandatory in the statute about regulating the hard rock mining industry. There's nothing about, you know, exactly how to select those classes other than looking at the line drawing exercise of what the degree of risk is and the duration of that risk. And EPA made that determination here. My opponent argues that some new interpretation was crafted in between the time of the proposed rule and the final action deciding not to go forward with the proposed rule and finalize it. But that's not true. EPA looked at both of the categories of looking at the term risk that my opponent says they need to look at. They said that providing funds to address circle liability at sites was an important consideration. But they also said that they should be looking at creating incentives for sound practices that will minimize the need for a future circle response. And that's at 83F 3rd 7557. They also said that they found that that concern of minimizing risk, because the existing program of both federal statutes, we're talking about the Clean Air Act, we're talking about especially the Clean Water Act, which has important implications for regulating mining. It has several... You're right that the statute doesn't say the President shall promulgate regulations for this industry. But has he promulgated regulations for any industry? At this point, there has been no... Remind me, when was CERCLA? CERCLA, we're talking about the mid-'80s. So, yes, it's true that Congress anticipated, Your Honor, I think trying to respond to your question, that there would be potentially... What's going on? Why is that the case? That's a long, long time. It is a long time, Your Honor, but it's one where... It's a very intricate question, which I think is what Judge Sentel was asking about, of looking at what is the degree of risk from classes of facilities. So you're saying in the last almost 40 years they've looked at this carefully, and they decided there's just no risk out there. Things are fine. Well, Your Honor, many of the environmental statutes, including CERCLA, they impose a lot of regulations that EPA needs to look at, considering whether to adopt, and the agency has to make priorities. Oftentimes the agency is dealing with other statutes it needs to issue rulemakings on, other CERCLA rulemakings it needs to issue. Eventually, obviously, the Idaho Conservation League sued, and this court in Idaho Conservation League won, specifically left open the prospect of not regulating here. The court said that EPA retained the discretion to promulgate a rule or to decline to do so, even for the hard rock mining industry. That's at page 514, 811, F3. And we think that's entirely consistent with the statute. It wouldn't have been possible to say that it would be mandatory to issue a rulemaking for this class, because Section 9608B1 includes discretion, and Your Honor was also focused on B2, which talks about the President's discretion explicitly. And we think that ties back to the construction of risk. And also it doesn't specify which classes to regulate from. And in particular, again, I think the term degree of risk is one that inherently conveys discretion to the agency or to the President initially, as Congress had done here. And that's something that you need to look at in terms of, you know, conditioning the ground for the world of Chevron. And I think it puts us clearly in Chevron's Step 2 territory. When both Judge Sintel and you, Judge Griffith, were asking questions about what text exactly is being violated, I think the only thing my opponent can say is to refer to the word shall. Now, as I pointed out, the agency did... I've done that good enough. Well, but in this instance, Your Honor, it does have the predicate question of deciding whether, you know, the degree of risk threshold has been met, and whether this is a particular class that it's appropriate to regulate. And those are things that we think are committed to the agency's sound discretion. We also think that the agency looked at both categories of risk. But as an alternative argument, I think it's important... Let's look at the text, if we could, at 90... You know, the key circle, a section here, B1 versus B2. So in the first sentence, right, it refers to the President issuing these regulations and establishing them consistent with the degree and duration of risk, right? It just refers to the word risk in an unadorned sense. And then if you go to B2, which Judge Griffith was asking about, you see that it talks about the level of financial responsibility being set and then being adjusted when necessary to protect against, again, the level of risk unadorned. So we think that's precisely why you can use B2 to help construe the first sentence of B1. It's just the term... The first sentence in B1, which is what we're really focused on here, setting the classes based on this line-drawing exercise of whether a sufficient degree of risk has been analyzed or not. In the third sentence, which is talking about prioritizing potentially multiple rules about regulating multiple classes, it specifically says not just risk unadorned, but risk of injury. And we think that it's basic statutory construction 101, really, under the Russello case, where Congress chooses to disparately include language or exclude language from particular provisions, that that has to be given meaning. So for purposes of doing the prioritization between multiple classes, you look at the risk of injury. But for purposes of doing the analysis of what class to regulate, whether a sufficient degree of risk has been reached, we think that is... The first sentence links up with B2, really has a focus on the fund. But in any event, the primary argument we have is that there has been no change from the proposed rule to the final action declining to adopt the proposed rule. EPA recognized all along that, including in the proposed rule, that minimizing drain on the CERCLA superfund was an important goal of the statute, so that didn't change between the proposed and the final. And they also recognized that the whole point of CERCLA is to reduce environmental risk. And that's all over the record. And indeed, that's the whole point of them having looked at the issue of what the baseline of mining was as regulated by the federal government and by the state. Because the regulation of mining by the federal government and the federal land management agencies, the Forest Service, BLM, is to reduce risk by imposing prescriptive requirements on the mining operations. So in the proposed rule, what EPA saw was being gotten wrong in that rule was that they were looking at the baseline backwards. The baseline in the rulemaking... The baseline, I'm sorry, that one would look at in the statute in the world is always to look at what is the current state of the world, right? And if you look at the current state of the world when EPA was considering these regulations, what you see is that that baseline included a lot of state regulation, a lot of development of state regulation, what EPA called the modern mining developments. And that all reduced environmental actual risk of injury. And they decided that you couldn't do what was contemplated in the proposed rule, which was to simply wait to look at the impact of state programs after you had imposed this massive new set of federal requirements, and then to decide, well, we'll soften those based on mining regulations in any particular state. That's backwards. You don't do a baseline analysis like that. You do a baseline analysis the other way around. You look at the world as you find it, and then you decide, in light of how you're finding it, is there a sufficient, again, degree of risk under B1 to engage in the regulation? So EPA decided that essentially it would have been arbitrary and capricious to continue with this regulation and to decide to finalize it when the baseline was backwards. They were only going to look at the baseline of existing mining regulation under federal law and state law once they had decided to impose this massive new financial assurance federal regime. So that's how we're looking at the statute, and we think that it clearly comports with Chevron Step 2. Can I ask you again about B1? Why couldn't it be read reasonably that the first risk, which is all-inclusive, the risk associated with the production, transportation, treatment, storage, disposal of hazardous substances, and then when you get down to prioritizing, that is that last sentence of B1, that's when you consider the risk of injury. In other words, you're supposed to consider all of these risks involved with everything dealing with hazardous materials, and then when you prioritize these classes, you look at the risk of injury. So, Your Honor, again, EPA did look at the risk of injury, so there's not a change. In order to begin to focus on that issue, I think you have to first imagine that EPA somehow radically changed from the proposed rule to the final rule in their interpretation of the statute, and that's really not accurate. They did look at the risk of injury from all of the sources, but to the extent of my fallback argument, that even if EPA had changed interpretations to focus on the Superfund risks and on the B2 factors, which really, again, isn't accurate, this is a situation in which the statute specifies that it's risk from the production, transportation, treatment, and storage. So it tells you what the risk is from, but it never tells you what the risk is to. And it would be entirely consistent with Chevron Step 1, because it's not clear, to construe structurally the evidence you have in B2, which is a focus exclusively on issues about how the Superfund is being drawn down, to help you construe what the unadorned term risk, the same unadorned term risk in B2, means in the first sentence of B1. Now, I want to make sure I understand your fallback argument. Did you say if they changed their interpretation? No. So our position is there was no change of interpretation. I understood that to be your first line. Right. So our fallback is even if the interpretation had been changed, it would be consistent with Chevron. Yeah, but if it had been changed under the Chevron analysis, don't we have to ask the agency, why did you change? Well, the agency did say that there's an important focus in the statute under B2 on reducing drain on the Superfund. So in that kind of situation, Your Honor, we think that it's an own inherent interpretation for doing that. But, again, the primary argument, which is really what we're standing on, is that there was no change in the first place. Okay. All right. Thank you. Thank you. Mr. Burgess. Thank you, Your Honor. Good morning. Brian Burgess on behalf of the Industry Interveners. I'd like to first focus on the statutory argument the Court's been discussing and then briefly talk about the modern mines argument that Petitioner raised. As Mr. Clark indicated, the 9608B1 is not directed specifically to the mining industry. The fact that the mining industry became subject to this rulemaking was because of a 2009 notice that we had no opportunity to comment on. We had no ability to explain the ways in which current mining operations do not pose a degree and duration of risk consistent with imposing new financial responsibility requirements. So that's what this rulemaking is all about. Industry, state regulators, federal regulators put forward evidence that the mining industry is already subject to comprehensive cradle-to-grave regulations. That includes permitting requirements that came in line largely in the 1990s that ensure only responsible operators are going to be engaged in these activities. They require detailed plans for reclamation and closure that impose substantial performance requirements. And they also come back with billions of dollars now in financial assurance. So there's just many, many layers of protection that apply to currently operating mines before there would ever be a risk of an unfunded cleanup. You have the permitting process. You have the performance and environmental standards that apply to current mining operations. You have the fact that if a spill occurs, there's monitoring and inspection to ensure that it's promptly detected and cleaned up. You have the private operators being obliged to clean it up consistent with their permitting conditions. And then if there's a problem, there's bonding that the state regulators and the Forest Service and BLM can enforce. So that's one reason why the argument that petitioners make that essentially private cleanups don't count, that that isn't an indicator that there's no risk to the fund or no risk to the environment, we think is clearly wrong because it shows that the permitting system that states and the federal land management agencies have is working as is intended to do. If an operator does not perform prompt cleanup once an issue is detected, the regulator can pull its permit and call in a bond. And so the fact that that is not happening, that instead operators are handling cleanup under their own account, shows that the system is working. I'd like to, in the remaining time I have, talk about the modern mines concept. Petitioner argues that there's sort of a mismatch between the agency's rationale and the scope.  Legacy mines, meaning mines that are no longer operational, were not going to be covered by the proposed rule at any point, including in the initial proposal. So EPA quite rightly found that evidence with respect to those mines was not going to be relevant to the rulemaking. As to the mines that are subject to the currently operating facilities, we consider that modern mining. The commenters made that clear. Those mines are subject to existing permitting requirements. They're subject to existing performance standards, which in some instances might require retrofitting. They are subject to existing monitoring requirements. They're subject to existing bonding requirements. To the extent that there's any, you know, I think Petitioner in the reply brief argues there are some instances in which a state regulator might determine that it's impracticable to retrofit a particular design. But states address that in other ways by, for example, having heightened monitoring requirements. And EPA was well aware of this in the final action. It referred to New Mexico's new copper rule, which imposed new protective requirements on new facilities, but paired that with enhanced mining requirements for existing facilities. And that's at page JA-19. So the argument that currently operating facilities are not subject to these requirements and that there is a risk of them if they don't have all the newest design features is just not borne out by the record. And the agency was not arbitrary capricious in its own finding. And as a final comment, I do think the standard of review is relevant here, because Petitioners are relying on a mandamus standard, which is even more deferential than ordinary arbitrary capricious. The sites, the cases they invoke for this Court's jurisdiction in terms of instances in which an agency has declined to finalize rulemaking indicate that there's an additional layer of deference that applies even above and beyond the ordinary arbitrary capricious standard that applies to agency action. If the Court has no questions, we ask you to deny the petition. All right. Thank you. Does Ms. Gooden have any time? Why don't you take two minutes? Use them wisely. I'll talk really fast, Your Honor. So I do want to point out that even if the Court is looking only, and even if EPA is looking only, at financial risk, risk to the super funds, they interpret the statute that way, they still ignored significant evidence of such risk. And I want to point to a few examples. So looking at, we mentioned in our briefs, a number of underground mines in Idaho that don't have any assurances for the underground portion of the mine. Nothing. They overlooked the Rasmussen Ridge mine in Idaho, where they discuss in detail that there's, you know, a few million in assurances held by federal agencies, but it's already caused massive contamination, and long-term water treatment will likely vastly exceed the cost of remediation. They look at the Buckhorn mine in Washington. That didn't start operating until 2008. It's already caused serious contamination, again, has minimal assurances, and will likely impose huge costs. So sites like these, where they haven't already incurred taxpayer costs, they say, this isn't relevant, even when there's obvious evidence of financial risk, just using their own more limited definition. Even the Kendall mine, for example, that one's no longer operating. But that mine, the operator's already bankrupt. They know that there's going to be a $6 million, at least, shortfall between the assurances and the cleanup costs. And they say, well, taxpayers will probably have to pay that, but it's still not all that important because that's less than maybe the total benefits of the rule. So they routinely dismissed even evidence of financial risk, even on their own kind of narrower view. I also want to point out one final thing on this legacy versus modern issue. So the Bingham Canyon mine, for example, and many others, they did, EPA said in their technical support document, these are legacy mines, we don't have to look at them, even though they're currently operating and would have been regulated, and again, they're on the list of JA 1975. If the court has no further questions, I see I'm out of time. All right. Thanks. Stand, please.
judges: Henderson, Griffith, Sentelle